Jesse and Dorothy **CAREY**, married individuals; Nicholas and Deborah Dassion, married individuals, Rebekah Dassion, a minor by Nicholas Dassion her father, as natural guardian and next friend, and Mihailo and Janet Bozidarevic, married individuals, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

**KERR–McGEE CHEMICAL CORPORATION**, a Delaware corporation, and Kerr–McGee Corporation, a Delaware corporation, Defendants.

No. 96 C 8583.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 18, 1999.

---

Paul Joseph Fina, Downers Grove, IL, Steve W. Berman, Hagens & Berman, Seattle, WA, Paul M. Weiss, Eric D. Freed, Freed Weiss & Flaum, Chicago, IL, Thomas A. Demetrio, Daniel M. Kotin, David Casey Wise, Corboy & Demetrio, Chicago, IL, Michael Jerry Freed, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, Chicago, IL, for plaintiffs.

Michael P. Connelly, Raymond Eugene Stachnik, Matthew Patrick Connelly, Connelly & Schroeder, Chicago, IL, Richard A. Meserve, Peter J. Nickles, Elliott Schudler, Alan A. Pemberton,. Covington & Burling, Washington, DC, for defendants.

### MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiffs Jesse and Dorothy Carey, Nicholas and Deborah Dassion, Rebekah Dassion by her father and guardian Nicholas Dassion, and Mihailo and Janet Bozidarevic brought a five count putative class action complaint against defendants Kerr–McGee Chemical Corporation and Kerr–McGee Corporation for property damage and personal injuries resulting from thorium tailings produced at defendants' West Chicago plant (the "Facility"). Counts I and II were for property damage, alleging continuing trespass and nuisance. Counts III, IV and V contained claims for both property damage and personal injury (medical monitoring), alleging strict liability for ultra-hazardous activity, negligence, and willful and wanton conduct. In its March 17, 1998, order, the court held that under Illinois law plaintiff's could maintain a claim for medical monitoring damages, but that the adult plaintiffs' claims were barred by the applicable statute of limitations. In addition, the court held that the property damage claims in Counts III, IV and V were also barred by the statute of limitations. Finally, the court held that Counts I and II, which alleged "continuing" torts, were insufficiently pled, but granted plaintiffs leave to file an amended complaint with respect to those counts only. *Carey v. Kerr–McGee,* 999 F.Supp. 1109 (N.D.Ill.1998).[1]

On May 19, 1998, plaintiffs filed a second amended complaint ("SAC"), purporting to comply with the court's March 17, 1998, order allowing them to replead the continuing tort counts. In the SAC, Counts I and II again attempt to allege continuing trespass and nuisance, but are now based on a claim that defendants are conducting EPA-ordered remediation in an improper manner, a claim not raised in the first two complaints. Counts III, IV and V are claims seeking medical monitoring on behalf of those persons who are 20 years old or younger as of December 16, 1961 (the "minor class") based on negligence, strict liability and willful and wanton conduct. On June 12, 1998, defendants moved to dismiss or for summary judgment, arguing that all plaintiffs' state law claims are preempted by the federal Price–Anderson Amendments Act, 42 U.S.C. § 2210, and that plaintiffs cannot prove a violation of the applicable federal standards. In addition, defendants argue that the continuing tort claims should be dismissed to the extent that they purport to be based on alleged dust emissions from EPA-ordered and monitored remediation, and that plaintiff cannot recover remediation costs because they have not incurred such costs. After defendants filed their motion, the parties conducted extensive discovery, lasting over six months. Accordingly, the court will treat defendants' motion as one for summary judgment pursuant to Fed. R.Civ.P. 12(b)(6).

Rather than just responding to defendants' motion, plaintiffs filed their own motion for partial summary judgment, seeking an order "dismissing the argument asserted by defendants that the Price–Anderson Act preempts state law claims." The obvious purpose behind this improper use of Fed.R.Civ.P. 56 was to gain an additional two briefs and have the last word on the Price–Anderson issue.[2] Both defendants' and plaintiffs' motions are now fully briefed and ready for disposition. For the reasons set forth below plaintiffs' motion is denied, and defendant' motion

---

1. A complete statement of facts and history of this case can be found in the court's prior opinion.

2. The motion is improper because plaintiffs are not seeking judgment of any kind, but rather seek only to defeat defendants' motion based on the Price–Anderson Act. Accordingly, the court treats the motion and the briefs relating thereto as simply additional argument on defendants' first ground for summary judgment. The court notes with disapproval, however, that despite the additional two briefs plaintiffs were unable to confine any of their submissions to the 15 page limit set forth in Local General Rule 9(b).

for summary judgment is granted in part and denied in part.

## DISCUSSION

As noted above, the parties have focused their briefs on the threshold issue of whether plaintiffs' state law claims are preempted by the Price–Anderson Amendments Act of 1988, 42 U.S.C. § 2210 (the "Amendments Act"). To understand the scope of the Amendments Act, it is necessary to view it in the context of the entire federal statutory scheme on nuclear power. In 1946 Congress passed the Atomic Energy Act, which initially gave the federal government a monopoly with respect to the development of nuclear power. *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1095 (7th Cir.1994). Congress later determined, however, that the private sector should be included in the development of atomic energy. Therefore, in 1954 Congress enacted the Atomic Energy Act of 1954 ("AEA"), which established the Atomic Energy Commission and gave it the authority to licence and regulate nuclear facilities. *Id. See* 42 U.S.C. § 2011–2281. This Act alone failed to spur the intended private sector entry into the field of nuclear energy because of a fear of potentially bankrupting liability absent some limiting legislation. *Id; Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 64, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Consequently, in 1957 Congress amended the AEA with the Price–Anderson Act, for the express purpose of "protecting the public and ... encouraging the development of the atomic energy industry." *Id.; El Paso Natural Gas Co. v. Neztsosie,* —— U.S. ——, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999). The Price–Anderson Act had three main features: it established a limit on the aggregate liability of those who undertake activity involving the handling or use of radioactive materials; it channeled public liability resulting from nuclear incidents to the federal government; and it established that all public liability claims above the amount of required private insurance protection would be indem-

nified by the federal government up to the aggregate limit on liability. *Id.*

The Price–Anderson Act was extended for an additional ten years in 1966. At that time Congress added a new provision which required that persons indemnified waive certain common law defenses in the event of an action arising out of an Extraordinary Nuclear Occurrence ("ENO"). Additionally, the 1966 amendment provided for transfer to federal court of all claims arising out of an ENO. *Id.* (citing 42 U.S.C. § 2210(n)(2)); *In re TMI Litigation Cases Consolidated II,* 940 F.2d 832, 852 (3rd Cir.1991). As noted by the Seventh Circuit, *O'Conner,* 13 F.3d at 1095 (quoting *Duke Power Co.,* 438 U.S. at 65–66, 98 S.Ct. 2620), these provisions were premised on:

> congressional concern that state tort law dealing with liability for nuclear incidents was generally unsettled and that some way of insuring a common standard of responsibility of all jurisdictions—strict liability—was needed. A waiver of defenses was thought to be the preferable approach since it entailed less interference with state tort law than would the enactment of a federal statute prescribing strict liability.

The Price–Anderson Act was amended twice more, in 1975 and, more significantly, in 1988 when Congress passed the Amendments Act. It is the scope of the Amendments Act that is relevant to the instant case.

The Amendments Act "expanded the reach of § 2210(n)(2) to provide for removal of, and original federal jurisdiction over, claims arising from any 'nuclear incident,' instead of actions arising only from ENOs." *Id.* Section 2210(n)(2) now provides in relevant part:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, ... shall have original jurisdiction without regard to

citizenship of any party or the amount in controversy. . . .

The Amendments Act defines a public liability action as "any suit asserting public liability." 42 U.S.C. § 2014(hh). A public liability action is deemed to be an action arising under § 2210, and the substantive rules for decision in such an action shall be derived from the law of the State in which the nuclear incident occurs, unless such law is inconsistent with the provisions of § 2210. *Id.*

It is against this statutory backdrop that the court must analyze defendants' claim that the instant case is one for public liability requiring plaintiffs to prove that defendants violated a standard of care set by federal regulation. Under the Amendments Act, any public liability action arising out or resulting from a nuclear incident arises under federal law, is "preempted" and "federal regulations must provide the sole measure of the defendants' duty. . . ." 42 U.S.C. § 2210(n)(2); *O'Conner,* 13 F.3d at 1105. A public liability action is any suit asserting public liability. 42 U.S.C. § 2014(hh). Public liability means any legal liability arising out of or resulting from a nuclear incident. 42 U.S.C. § 2014(w). A nuclear incident is "any occurrence, including an ENO, within the United States causing ... bodily injury, sickness, disease, death, or loss of or damage to property or loss of use of property arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear or byproduct material." Therefore, for defendants' argument to prevail, they must establish that plaintiffs' claims are: 1) asserting legal liability; 2) resulting out of or from any occurrence, including an ENO, within the United States, which; 3) arises out of or result from radioactive, explosive or other hazardous properties of source, special nuclear or byproduct material.

Thorium is a "source material," 42 U.S.C. § 2014(z), and thorium tailings are "byproduct materials." 42 U.S.C. § 2014(e). Because plaintiffs' claims are for personal injury and property damage

resulting from the release of thorium tailings from defendants' West Chicago facility, defendants argue that the claims fall squarely within the plain wording of the statute.

Plaintiffs, relying exclusively on *Gilberg v. Stepan Co.,* 24 F.Supp.2d 325 (D.N.J. 1998), argue that for there to be an "occurrence" as that term is used in the definition of nuclear incident, there must be a release of radioactive material from a facility which is both (a) licensed by the NRC and (b) covered by an indemnification agreement with the NRC. Because the Facility, although subject to certain licensing, was not a signatory to an indemnification agreement, plaintiffs argue that there has been no "occurrence" as the term is used in the statutory scheme, and thus they are not asserting liability from a nuclear incident. Therefore, plaintiffs' argue, their claims are not preempted by the Amendments Act, and state law standards of care govern the actions. The resolution of the issue rests on the construction of the word "occurrence" as used in the definition of "nuclear incident."

 It is a fundamental cannon that "all statutory interpretation begins with the language of the statute itself, and where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Pittway Corp. v. United States,* 102 F.3d 932, 934 (7th Cir. 1996). "[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). Looking beyond the express language of a statute is unnecessary unless the statutory language is ambiguous or a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme. *United States v. On Leong Chinese Mech. Assoc. Bldg.,* 918 F.2d 1289, 1296 (1990). "Courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *In the Matter of Lifschultz Fast Freight*

*Corp.*, 63 F.3d 621, 628 (7th Cir.1995) (quoting *Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). Courts are bound to follow express statutory definitions, even an odd, nonstandard or technical definition, but in the absence of such an express definition must give terms their ordinary meaning. *United States v. Bank of Farmington*, 166 F.3d 853, 865 (7th Cir.1999).

Section 2014 sets forth all of the express definitions adopted by Congress in the AEA and all of the subsequent amendments thereto, including the Price–Anderson Act and the Amendments Act. The section currently contains 35 distinct definitions. There is no express definition of the term "occurrence" among those 35. Therefore, the term should be given its ordinary meaning. Webster's Third New International Dictionary (1993) defines occurrence as "something that takes place; esp. something that happens unexpectedly and without design; or the action or process of happening or taking place." The Oxford English Dictionary (1989) defines occurrence as "the fact of occurring i.e. of presenting itself, being found or met with, turning up or of happening, taking place."

Substituting the broad ordinary meaning of occurrence into the definition of a nuclear incident, section 2210(n)(2) reads:

> The term nuclear incident means any [happening or event] including an extraordinary nuclear [happening or event] ... causing bodily injury, loss or damage to property, or loss of use of property arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear or byproduct material.

Defendants are therefore correct, that if the term occurrence is given its common ordinary meaning, plaintiffs' action is one for public liability and is preempted by federal law.

Without explicitly rejecting the cannon that words must be given their ordinary meaning in the absence of an express statutory definition, the *Gilberg* court went searching for another, narrower meaning of the term occurrence by reviewing its use throughout the statutory scheme and by reviewing the legislative history of the PAA and the Amendments Act. Applying another "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation but must be drawn from the context in which it is used," the *Gilberg* court found it "significant that the definition of nuclear incident employs 'occurrence' in concert with the clause 'including an extraordinary nuclear occurrence,' so as to read the term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." 24 F.Supp.2d at 332.

*Gilberg* then reviewed the express definition of an extraordinary nuclear occurrence, which is defined as "any event causing a discharge ... from its intended place of confinement in amounts off-site, or causing radiation levels off-site, which the Nuclear Regulatory Commission ... determines to be substantial. As used in this subsection 'off-site' means away from the location or the contract location as defined in the applicable ... indemnity agreement entered into pursuant to § 2210 of this Title." *Id.* Therefore, according to *Gilberg*, "[a]n occurrence which underlies the definition of an 'ENO' cannot be just any 'event,' but can only be an event at the location or the contract location as those terms are defined in the applicable indemnity agreement." *Id.*

Because of what it termed a proximity to and the interrelationship between the word occurrence and the phrase extraordinary nuclear occurrence, *Gilberg* then applied the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Id.* (quoting *Commissioner v. Lundy*, 516 U.S. 235, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996)). *Gilberg* found that "as the matter of statutory construction, therefore, the occurrence which underlies a nuclear incident,

can only be an event at 'the location' or 'the contract location' as that term is defined in an indemnity agreement entered into under § 2210." Relying on this holding, plaintiffs argue that because defendant has not entered into an indemnity agreement there is no occurrence and thus no nuclear incident. Absent the nuclear incident, the suit is not a public liability action and is not preempted by § 2210(n)(2).

Although Gilberg presents a thoughtful and an exhaustive examination of the statute, it provides only one logical construction that the court readily admitted results from a path that is not "self evident." *Id.* at 339. There are, in fact, numerous problems with the path *Gilberg* takes. First, and perhaps most obvious, is the use of a narrowing term to restrict what was obviously intended to be a broader term. Although an ENO is defined as causing damage "off-site," the term "off-site" is not found in the definition of nuclear incident, which was intended to be broader than an ENO, which is included within the definition of nuclear incident. Congress could have defined or limited a nuclear incident as one causing damage "off-site," but did not do so, and this court must presume that it meant what it said.

*Gilberg*'s analysis also selectively applies the statutory cannon that words cannot be determined in isolation, and identical words used in different parts of the same act are intended to have the same meaning. *Gilberg* looks to only one section of the statute that employs the term ENO, without looking at others. For example, § 2210(n)(*l*) provides "with respect to any ENO to which an ... indemnity agreement applies and which...." Under *Gilberg*'s analysis, the phrase "to which an indemnity agreement applies" would be superfluous, because there could be no ENO without an indemnity agreement. The inclusion of the phrase clearly indicates Congress' belief that there can be an ENO to which no indemnity agreement applies.

Additionally, § 2210(s) provides that "[n]o court may award punitive damages in any action with respect to a nuclear incident ... against the person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident...." Again, the inclusion of the phrase "under an agreement of indemnification covering such incident," indicates that there can be an incident not covered by an indemnity agreement pursuant to which punitive damages may be awarded. Moreover, § 2014(t) defines "person identified" as the person with whom an indemnity agreement has been executed and any other person who may be liable for public liability. If the *Gilberg* analysis is correct, punitive damages could never be awarded because there would always be an indemnity agreement and liability would always be against a person indemnified. Therefore, if the term nuclear incident were limited to sites subject to an indemnity agreement, Congress would have simply eliminated punitive damages in all public liability actions. It did not do so, indicating that a nuclear incident can occur at a site not subject to an indemnity agreement.

Finally, it also appears that *Gilberg*'s restrictive reading of the plain wording of the statute is at odds with Congress' intent when it enacted the Amendments Act. It is universally accepted that the Amendments Act was promulgated as a result of the claims experience arising out of the incident at the Three Mile Island Nuclear Reactor Facility ("TMI"). As noted by *Gilberg,* the TMI incident generated in excess of 150 separate lawsuits filed in various state and federal courts, asserting public liability on behalf of over 3,000 claimants. *Gilberg,* 24 F.Supp.2d at 337. Because the NRC determined that the accident did not release radioactive materials in an amount sufficient to constitute an ENO, no district court had jurisdiction to hear the claims, absent complete diversity of citizenship. As a result, the provisions of the PAA as it then existed, which allowed for consolidation of ENO related claims in one federal court, were unavailable to defendants in the TMI cases, leav-

ing the lawsuits to proceed separately in various jurisdictions under various state laws.

As a result, Congress enacted § 2210(n)(2), creating federal jurisdiction over all public liability actions arising out of or resulting from a nuclear incident. Nuclear incident was intentionally defined broadly to avoid problems like TMI. The obvious import of the amendment was to insure that all claims resulting from a given nuclear incident would be governed by the same law, provide for coordination of all phases of litigation and the orderly distribution of funds, and assure that preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident. *TMI II,* 940 F.2d at 856–57.

■ Of course, the TMI facility was subject to an indemnification agreement, but the problem Congress was addressing was the lack of federal jurisdiction over, and the failure of federal law to apply to incidents that did not amount to ENOs. Under *Gilberg*'s analysis, there are two ways an incident would not rise to the level of an ENO. The first, demonstrated by TMI, is that the release is not substantial as determined by the NRC. The second is that the release did not come from a facility covered by an indemnity agreement. Congress' response was to create preemption, removal and consolidation provisions extending to all cases involving nuclear incidents, which Congress defined broadly and specifically did not limit to releases affecting property "off-site." The fact that Congress' solution results a broader class of nuclear liability cases than the particular case to which it was responding is no reason to limit the broad language used. Accordingly, this court concludes that § 2210(n)(2) is applicable, and plaintiffs must establish a violation of federal standards.

Having determined that federal law applies, the question becomes which federal regulations provide the applicable standard of care. As both parties recognize, the Amendments Act does not itself establish any particular radiation exposure standards, but rather simply requires state law to conform to applicable federal exposure regulations. *O'Conner,* 13 F.3d at 1105.

■ Citing to an agreement between the Environmental Protection Agency ("EPA") and the AEC, the "Atomic Energy Commission Memorandum of Understanding Regarding AEC–License Facilities," 38 Fed.Reg. 175 (September 11, 1993), plaintiffs argue that EPA regulations govern radiation exposures or levels in the general environment "outside the site boundary" of any AEC–Licensed Facility. Plaintiffs, however, do not direct the court to any specifically applicable EPA regulation. Nor have plaintiffs directed the court to any case holding that EPA regulations provide the applicable standard of care, and this court's own research has revealed none. In contrast, *O'Conner* applied the NRC Federal Dose Standards contained in 10 C.F.R. Part 20 *et seq.,* as has every other case the court has found dealing with this issue. *See E.G. Whiting v. Boston Edison Co.,* 891 F.Supp. 12 (D.Mass.1995); *Roberts v. Florida Power & Light Co.,* 1997 WL 382035 (S.D.Fla.); *Bohrmann v. Maine Yankee Atomic Power Co.,* 926 F.Supp. 211, 219–20 (D.Me.1996). Indeed, in *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 24, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), the Supreme Court specifically held that discharge of source, byproduct and special nuclear materials are not regulated by the EPA. The court explained the division of authority between EPA and NRC under the Reorganization Plan No. 3 of 1970, which established the EPA, as "EPA was to set generally applicable radiation standards, limiting the total amount of permissible radiation in the environment from major categories of sources, while the AEC [predecessor to the NRC] was to prescribe the limitations applicable to discharges of licensed materials from particular sources which contribute to the total." *Id.* at 24 n. 20, 96 S.Ct. 1938. Accordingly, the court concludes that NRC regulations,

not EPA regulations provide the standard of care to be applied in the instant case.

That leaves the final question of which NRC regulations control. Defendants argue that the applicable standards are the specific regulations that limit the emission of radionuclides from licensed facilities. The current versions of those regulations require licensees "to conduct operations so that—(1)the total effective dose equivalent to individual members of the public from licenced operation does not exceed 0.1 rem (one milliservert) [100 millirem ('mrem')] in a year, exclusive of the dose contribution from [other sources]." 10 C.F.R. § 20.1301(a)(1). Prior to 1994, the standard was set at 0.5 rem (500 mrem). 10 C.F.R. § 105(a)(1991).

Not surprisingly, plaintiffs do not agree that § 20.1301(a)(1) applies, arguing that even if NRC's regulations apply, the applicable standard is a "sliding, non-numeric standard known by the acronym 'ALARA' or As Low As Reasonably Achievable." According to plaintiffs, ALARA is a fundamental and long standing policy of federal radiation regulations.

10 C.F.R. part 20 provides the standards for protection against radiation. Subpart B, entitled "Radiation Protection Program," provides that each licensee shall develop, document and implement a radiation protection program commensurate with the scope and extent of the licensed activities. § 20.1101(a). "The licensee shall use, to the extent practical, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to the members of the public that are as low as reasonably achievable (ALARA)." To implement the ALARA requirement, licensees are required to establish a constraint on air emission of radioactive material to the environment such that the individual members of the public likely to receive the highest dose will not be expected to receive a total effective dose equivalent in excess of 10 mrems per year. This constraint shall be established notwithstanding the dose limit in § 20.1301, and any

emission exceeding that constraint must be reported and corrected. In contrast, Subpart D, entitled "Radiation Dose Limits for Individual Members of the Public," provides that each licencee shall conduct operations so that the total effective dose equivalent to individual members of the public from the licenced operation does not exceed 0.1 rem in a year, exclusive of exposures from other sources. 10 C.F.R. § 20.1301(a)(1).

Several courts have addressed the issue of which federal regulation represents the standard of care to be applied to negligence claims in a public liability action. *See Corcoran v. New York Power Authority*, 935 F.Supp. 376, 386 (S.D.N.Y.1996); *McLandrich v. Southern California Edison Co.*, 942 F.Supp. 457, 467 (S.D.Cal. 1996). All but one have concluded that the standard of care is set by the dose limits, not ALARA. Most of the cases rely on the Third Circuit's opinion in *In re TMI*, 67 F.3d 1103, 1115 (3d Cir.1995) (*"TMI III"*), in which the court examined the applicable dose requirements and ALARA requirements and concluded that:

> Adopting ALARA as part of the standards of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have been explicitly reserved to the federal government in general and the NRC specifically....

As noted, one court has disagreed with this result. In *McCafferty v. Centerior Service Co.*, 983 F.Supp. 715, 718 (N.D.Ohio, 1997), the court noted that *TMI III* involved a pre–1991 ALARA regulation that was contained in 10 C.F.R. part 50 dealing with licensing of production and utilization facilities. The 1991 amendment inserted ALARA into part 20, the "standards for protection against radiation." The *McCafferty* court found this insertion significant enough to hold that both ALARA and the specific dose limit set forth the applicable standard of care. *Id.*

Although *McCafferty* is correct that the *TMI III* holding was based in part on the fact that ALARA was not, at that time, included in the radiation protection standards, it was, as already noted, also based on the concern that adopting ALARA as part of the standard of care would leave to juries the determination of permissible levels of exposure. As *TMI III* noted, 67 F.3d at 1115–16,

> Adoption of a standard as vague as ALARA would give no real guidance to operators and would allow juries to fix the standard case by case and plant by plant. An operator acting in the upmost good faith and diligence could find itself liable for failing to meet such an illusive standard. Our holding protects the public and provides owners and operators of nuclear power plants with a definitive standard by which their conduct will be measured.

■ The concerns expressed by the court in *TMI III* are as real today as they were when written, regardless of the inclusion of ALARA within the regulations. ALARA sets forth constraints that are to be met, and reported and corrected when not met. It does not set forth the standard of care for a public liability action. Accordingly, this court concludes that the standard of care is set forth by the Radiation Dose Limits for Individual Members of the Public applicable for the time of the releases in question.[3]

Having determined the appropriate standard of care, the court turns now to defendants' specific claims that they are entitled to summary judgment on the remaining counts.

## Counts I and II—Continuing Torts

In Counts I and II, plaintiffs allege the continuing torts of trespass and nuisance.

As noted above, the court originally dismissed these claims because the amended complaint, which alleged only that defendants have committed trespass and nuisance by "depositing radioactive thorium on their properties without the owners permission or invitation," failed to allege whether the depositing of the thorium continues or simply that the thorium remains deposited. *Carey v. Kerr–McGee*, 999 F.Supp. 1109, 1117 (N.D.Ill.1998). Because plaintiffs had argued in their briefs that defendants had a huge uncovered pile of thorium tailings ("Mt.Thorium") on the site as late as 1995, and that the wind had continued to deposit tailings onto plaintiffs' property as of that date, the court granted plaintiffs an opportunity to amend Counts I and II to incorporate the Mt. Thorium allegations into the complaint.[4]

■ In the SAC, plaintiffs added not only the Mt. Thorium allegations, but also a new claim that dust is being deposited onto their properties as a result of "Kerr–McGee's ongoing remediation of contamination located on class members' properties and on public property located within the Class Area." As noted in the court's original opinion, a continuing violation is occasioned by continuing unlawful acts and conduct, not continuing ill effects from an initial violation. *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 762, 158 Ill.Dec. 335, 574 N.E.2d 129 (1st Dist.1991). The conduct complained of in the amended complaint was a release of thorium tailings from the Facility onto plaintiffs' property. Because the amended complaint did not sufficiently allege that such conduct continued, the court granted plaintiffs leave to amend the

---

3. 10 C.F.R. § 20.1301(d) provides that in addition to the requirements of part 20, a licensee subject to the provisions of EPA's generally applicable radiation standards in 40 C.F.R. part 190 shall comply with those standards. 40 C.F.R. part 190 applies to radiation doses introduced into the general environment as a result of operations that are part of a nuclear fuel cycle, which is defined as actions associated with the production of electrical power for public use. Because the facility was not a nuclear power plant, part 190 is inapplicable.

4. In its previous opinion, the court mistakenly referenced footnote five of the amended complaint as alleging that the NRC found the tailings cover to be in disrepair in 1995 instead of 1985.

complaint to add the factual allegations they had supplied in their briefs.

As plaintiffs readily admit, however, Counts I and II now try to assert a claim for negligent or improper remediation. This is not a continuation of the claim based on the release of thorium from the facility, but a whole new claim based on completely different conduct; "a fundamental change in the theory of their case." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir.1993). As Judge Posner noted in *Chaveriat*, this is "not a matter of introducing new evidence, or changing merely the legal conceptualization of their claim, but of injecting an entirely new and separate claim." *Id.* at 1428–29. The release of thorium tailings blown from a mound located on the facility is a different tort from a negligent remediation of plaintiffs' property, even if the thorium being remediated initially came from the facility. *Id.*

The amended complaint was 33 pages long. It was very factually specific, except for the deficiencies relating to the continuing tort claims. The issues raised in the motion to dismiss the amended complaint were difficult and the briefing was extensive, lasting over five months with some briefs exceeding 45 pages. The court's opinion was equally comprehensive and specific. By granting plaintiffs leave to amend their complaint to add the factual allegations raised in their briefs in response to the motion to dismiss, the court did not grant plaintiffs carte blanche to create a whole new lawsuit.

Plaintiffs never sought leave to add this new claim to their complaint. They stealthily inserted it into the SAC, trying to bootstrap it to the continuing tort claim. Had they sought leave, the court would have denied it. The claim is not newly discovered, the remediation has been ongoing since before this lawsuit was filed, over two and one-half years ago. Counts I and II of the SAC do not even allege that the remediation is done in violation of any applicable standard, and their briefs identify little evidence to support their claim.

Despite the fact that plaintiffs had nine months to conduct discovery on the issue, plaintiffs suggest in their briefs that "discovery on this issue is far from complete."

The decision whether to permit a complaint to be amended is left to the court's discretion. *Id.* Here, without even seeking leave, plaintiffs have added a claim which essentially changes the entire case, including the scope of liability. There was no reason to wait until the SAC to add the claim, and no reason to do so without following proper procedure. Accordingly, the court dismisses without prejudice all claims in the SAC based on negligent or improper remediation. If plaintiffs really believe they have such a claim, they can file a new lawsuit and take all the discovery they need.

That leaves plaintiffs' claims in Counts I and II based on thorium tailings being released from the Facility, at least until 1995. Defendants assert in their motion that there is no evidence of any violation of the applicable NRC standards within the limitations period. In support of this argument they rely on an affidavit from Mark S. Krippel, Site Manager for the West Chicago facility. Krippel has had responsibility for environmental measurements at the facility since 1981.

According to Krippel's affidavit, the tailings storage pile at the Facility was covered with asphalt in the early 1980s to respond to the NRC's concerns. An additional cover of soil was added in 1985. The tailings were removed and shipped to a disposal facility in Utah in 1994 and 1995 pursuant to a decommissioning plan authorized by the Illinois Department of Nuclear Safety ("IDNS"). That decommission plan continues to date. According to Krippel, the Facility is licensed pursuant to the AEA. It was regulated by the NRC until 1989, when the NRC entered an agreement with IDNS giving IDNS regulatory control. Krippel states that throughout his tenure at the facility defendants maintained a network of monitoring stations along the boundaries of the facility to mon-

itor any emissions of radioactive materials, and that the data collected indicates that dust emissions in 1990 and beyond were well below the applicable NRC dose limits. According to Krippel the IDNS has never cited the facility for a violation of the dose limits from 1990 to the present.

■ In response, plaintiffs do not deny any of Krippel's conclusions that, based on the monitoring results at the facility, no continuing contamination is occurring. Plaintiffs do state that Krippel's statements are vague and do not identify the actual emission ratings, but plaintiffs have not moved to strike Krippel's affidavit. Nor have they presented any evidence to suggest that any emissions were over the allowable limits. Instead, plaintiffs resort to their argument rejected above that Illinois common law standards, not NRC dose limits, apply to the instant case. Accordingly, because plaintiffs have presented no evidence that thorium tailings in excess of the NRC dose limits were being released from the Facility during the relevant time period, defendants' motion for summary judgment on Counts I and II is granted.

**Medical Monitoring Claims**

In its March 17, 1998, opinion the court held that plaintiffs had stated a claim for medical monitoring, but that the adult plaintiffs' claims were barred by the applicable statute of limitations. Defendants now seek summary judgment on the minor plaintiffs' medical monitoring claims, arguing that plaintiffs have no evidence of significant exposure and significant risk of contracting serious latent diseases. In addition, defendants argue that plaintiffs cannot prove the existence of accepted medical monitoring regimes that make early detection of radiogenic diseases possible and beneficial.

In support of their argument that plaintiffs cannot establish significant exposure or risk, defendants rely on the affidavit of Douglas Chambers, Vice–President and Director of Radioactivity and Risk Studies at SENES Consulting Limited, a consulting firm specializing in environmental radi-

ation health issues. Chambers states that every living thing on the planet is subjected to naturally occurring radiation in an average dose of approximately 300 mrem per year, and that a range from 100 mrem to 1000 mrem represents a typical variation in annual background doses for most United States citizens in a given year. Chambers then estimates the incremental dose that he says might arise from thorium tailings by evaluating the various possible ways in which a person might be exposed to radiation from the tailings, including external gamma radiation, inhalation and ingestion. He then concluded that it is "unlikely" that a person from 1976 to the present (i.e. a member of the minor class) incurred an annual dose in excess of 100 mrem per year as a result of the tailings. He states that the typical incremental dose would likely be "on the order of 10 mrem per year or less." Because this is less than the applicable NRC dose limits, defendants argue that plaintiffs cannot prove their medical monitoring claims.

Additionally, defendants have submitted an affidavit from Fred A. Mettler, Professor and Chairman of the Department of Radiology and Nuclear Medicine at the University of New Mexico in Albuquerque. Mettler is also the Scientific Vice–President of the National Council on Radiation Protection and Measurements ("NCRP") and a Commissioner of the International Commission on Radiological Protection, organizations that recommend radiation dose limits to regulating agencies and national governments. Mettler concludes that medical monitoring is not only unnecessary, but could be harmful. Mettler notes that the primary human health effect associated with radiation exposure is cancer, but that cancer is not observed at lower doses. He states that scientific evidence for increased risk of the indication of disease is uncertain at doses below 10 rem. According to Mettler, the only types of cancer for which cancer screening tests have any benefit are cervical, colon and breast cancer. Mettler states that there is

no scientific evidence that the incidents of cervical cancer is increased by exposure to radiation. The incidents of colon cancer is slightly alleviated in groups exposed to radiation at high dose levels. Because all individuals are encouraged to receive screening for colon cancer regardless of radiation exposure, Mettler concludes that there is no additional testing that can or should be performed on plaintiffs. The incidents of breast cancer has been shown to increase with radiation exposure, although at doses generally in excess of 50 rem. Because radiogenic breast cancer develops in women at the same age as nonradiogenic breast cancer, and because all women over age 40 are encouraged to receive breast cancer screening, Mettler states that there is no additional testing or screening that should be performed for those exposed. In short, Mettler states that there is no beneficial purpose for medical monitoring of the proposed class because the population is not at a significantly increased risk of contracting disease, and any such risk does not make additional periodic examinations reasonably necessary. Finally, Mettler states that no monitoring or screening procedures exist that would make early detection possible or beneficial to persons in the proposed class.

To combat defendants' experts, plaintiffs offer an affidavit from Marvin Resnikoff, Principal Manager and Senior Associate at Radioactive Waste Management Associates, who concludes that the exposure levels of West Chicago children greatly exceed protective limits. Resnikoff states that plaintiff Rebekah Dassion's yearly exposure limit is over three times the NRC limit for adult members of the general public (100 mrem per year). Resnikoff disagrees with Chambers' assessment that the typical incremental dose to a resident

in West Chicago from exposure to tailings is 10 rems per year or less. Resnikoff's calculations, which he states are only preliminary, indicate that Rebekah Dassion has received a minimum annual incremental whole body dose of radiation of over 300 mrems per year. He then states that because his calculations do not account for all possible pathways of exposure, the minor plaintiffs' actual exposure is most probably higher.[5]

Plaintiffs also offer an affidavit from Malin Dollinger, Clinical Professor of Medicine at the University of Southern California School of Medicine. Not surprisingly, Dollinger disagrees with Mettler, concluding that medical monitoring will benefit the minor plaintiff class because: 1) chronic exposure by members of a vulnerable population (children) significantly increases their risk of developing cancer; and 2) both educational counseling and monitoring will benefit the class by "arming them with useful information to monitor their own health as well as providing for early detection of treatable symptoms and diseases." Dollinger admits that there is some difference of opinion in the scientific community regarding how low a dose of ionizing radiation is required to produce health effects, but states that valid, published and peer reviewed studies have demonstrated to a reasonable degree of scientific certainty the risk of genetic changes at exposure levels similar to those in West Chicago. He states, however, that an increased risk "does not depend on any particular dose of ionizing radiation since any dose above background increases the risk of a critical DNA/genetic mutation, causing cancer." Therefore, Dollinger follows a "no-safe-dose" rule known as the linear non-threshold hypothesis. The basis of the rule is that a single ionization

---

**5.** Defendants admit that if Resnikoff's dose estimates are accepted there is a period of time after January 1994 during which the minor plaintiffs were exposed to thorium in amounts greater than the applicable NRC limits. Defendants suggest that Resnikoff's testimony is inadmissible under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that in its absence the court will be compelled to grant defendant summary judgment, but have presented no motion to bar Resnikoff's testimony.

event is capable of producing critical DNA changes leading to a cancer mutation. The most common theory is that two "hits" are required to produce a cancer mutation. Therefore, prolonged exposure increases the chance of more than one hit.

In their reply brief, defendants challenge Dollinger's conclusions because they are based on his view that any exposure results in a significant increased risk of illness sufficient to warrant medical monitoring. They challenge the "linear non-threshold hypothesis" as untested and unreliable for judicial decision making, but their own expert, Dr. Mettler, acknowledge that it is applied by the radiation-protection and regulatory communities. Defendants argue that numerous courts have rejected this theory as unscientific and inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See, e.g., Whiting*, 891 F.Supp. at 25; *National Bank of Commerce v. Associates Milk Producers, Inc.*, 22 F.Supp.2d 942, 960 (E.D.Ark.1998).

Based on cases such as *Whiting* and *National Bank of Commerce*, defendants argue that the court should reject Dollinger's opinions outright, leaving plaintiff with no evidence as to the justification or need for medical monitoring. As plaintiffs point out, however, each of these cases relied on by defendants involved motions to bar the experts' testimony under *Daubert*, and the motions were granted only after full *Daubert* hearings. Additionally, in each of the cases, the linear non-threshold hypothesis was used to establish that the plaintiffs' cancer was in fact caused by his or her documented exposure. In the instant case, plaintiffs need only establish that they have a reasonable need for the protective measure of medical monitoring. On paper at least, Dr. Dollinger appears to be well qualified and his opinions appear to meet the *Daubert* stan-

dard. Even without his controversial linear non-threshold hypothesis, Dr. Dollinger's affidavit states that valid, published and peer review studies have demonstrated to a reasonable degree of scientific certainty the risk of genetic changes at exposure levels similar to those experienced by the minor plaintiffs. Accordingly, on this record, Dr. Dollinger's affidavit raises a genuine issue of material fact as to whether plaintiffs can establish justification for medical monitoring. Therefore, defendants' motion for summary judgment on the medical monitoring claims is denied.[6]

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on plaintiffs' property damage continuing tort claims (Counts I and II) is granted. Defendants' motion for summary judgment on plaintiffs' medical monitoring claims is denied. This case is set for a report on status on August 30, 1999, at 8:30 a.m., at which time the parties are directed to present a definitive joint final discovery plan calculated to have the case tried in the summer of 2000.

---

**6.** Defendant's have also moved to strike the minor plaintiffs' request for punitive damages. In light of the court's decision denying defendant's motion for summary judgment on the medical monitoring claims, the motion to strike is denied without prejudice to renewal at trial.