ESTATE OF Jeffrey H. WARE, by Barbara BOYER, Individually, on behalf of Wrongful Death Beneficiaries, and as Administratrix of the Estate of Jeffrey H. Ware, Plaintiff,

v.

HOSPITAL OF the UNIVERSITY OF PENNSYLVANIA, University of Pennsylvania, Perelman School of Medicine University of Pennsylvania, Trustees of the University of Pennsylvania, Ann R. Kennedy, D.S.C., Gary Kao, M.D., Michelle Alonso–Basanta, M.D., National Space Biomedical Research Institute, and Center for Acute Radiation Research, Defendants.

Civil Action No. 14–14.

United States District Court, E.D. Pennsylvania.

Filed Dec. 19, 2014.

complaint, attached thereto) filed by the defendants (Doc. No. 1), the parties' submissions relating to the motion to remand (Doc. Nos.13, 14, 15), the report and recommendations filed by United States Magistrate Judge M. Faith Angell (Doc. No. 20), the objections to the report filed by the plaintiff (Doc. No. 23), and the defendants' responses to the objections (Doc. Nos. 25, and 26); accordingly, it is hereby **ORDERED** as follows:

1. The plaintiff's objections to the report and recommendations (Doc. No. 23) are **OVERRULED;**[1] and

2. The Honorable M. Faith Angell's report and recommendations (Doc. No. 20) is **APPROVED** and **ADOPTED;** and

3. The motion to remand (Doc. No. 9) is **DENIED.**

Aaron J. Freiwald, Laura E. Nowicki, Layser & Freiwald PC, Philadelphia, PA, for Plaintiff.

Daniel J. Sherry, Marshall, Dennehey, Warner, Coleman & Goggin, King of Prussia, PA, Donald E. Jose, Jose & Associates, Malvern, PA, Dean F. Murtagh, Kathryn A. Dux, German Gallagher & Murtagh, Philadelphia, PA, for Defendants.

### ORDER

EDWARD G. SMITH, District Judge.

**AND NOW,** this 19th day of December, 2014, after considering the motion to remand filed by the plaintiff (Doc. No. 9), and after also considering the notice of removal (and the documents, including the

### REPORT AND RECOMMENDATION

M. FAITH ANGELL, United States Magistrate Judge.

### I. INTRODUCTION.

The above-captioned matter was referred to me, by the Honorable Thomas N. O'Neill, Jr., for all pretrial proceedings. *January 7, 2014 Order* [Document 3]. On April 22, 2014, this case was transferred to the docket of the Honorable Edward G. Smith. Currently before me for Report and Recommendation is Plaintiff's motion to remand to the Philadelphia Court of Common Pleas. After holding oral argument and upon consideration of the parties' pleadings, for the reasons which follow, I recommend that Plaintiff's motion to remand be denied.

---

1. The court conducts a *de novo* review and determination of the portions of the report and recommendations by the magistrate judge to which there are objections. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *see also* E.D. Pa. Loc. R. Civ. P. 72.1(IV)(b) (providing requirements for filing objections to magistrate judge's proposed findings, recommendations or report).

## II. BACKGROUND.

On December 3, 2013, Plaintiff Barbara Ware, widow of Dr. Jeffrey H. Ware and administratrix of his estate, filed this action in the Philadelphia Court of Common Pleas. In her complaint Plaintiff alleges that Dr. Ware, a neuroscientist, had been employed as a researcher in the radiation oncology department at the University of Pennsylvania's Perelman School of Medicine from 1995 through the date of his death on October 23, 2011. Plaintiff alleges that Dr. Ware died of gliosarcoma, a rare form of brain cancer that is associated with excessive radiation exposure. Plaintiff summarizes her claims as follows:

"This case involves the tragic death of Jeffrey Ware, a brilliant neuroscientist and senior researcher at the University of Pennsylvania, who died, at age 47. Dr. Ware died of gliosarcoma, an exceedingly rare form of malignant brain cancer that is associated with radiation exposure. For many years, Dr. Ware was unwittingly exposed to excessive levels of radiation while researching the biological effects of radiation on animals as a means to understanding the health risks to humans and developing countermeasures to such risks.

The University of Pennsylvania and its various corporate entities, along with Dr. Ware's supervisors and research coordinators, failed to take appropriate precautions to protect Dr. Ware from various forms of radiation during his many years of research. For example, Defendants failed to monitor his radiation exposure, as was clearly required. It is no exaggeration to say that the University of Pennsylvania took better care of pigs, ferrets and mice that were the subject of the radiation-exposure research than they took of Dr. Ware. These allegations are set out in great detail in the Complaint [ . . . ].

Dr. Ann Kennedy, a Penn radiation biologist, recruited Dr. Ware for his expertise in the use of protease inhibitors to prevent biologic changes that can lead to cancer. Dr. Kennedy's research, with the help of Dr. Ware, evolved into studying the effects of radiation on astronauts during deep-space exploration. Dr. Kennedy directed radiation-related research that attracted millions of research dollars, including a $10 million project funded by Defendant National Space Biomedical Research Institute (NSBRI), a non-profit created by NASA to carry out research goals, specifically research into mitigating the adverse and deadly effects of radiation on astronauts. Yet Dr. Kennedy and her fellow supervisors failed to follow clear regulations requiring individual dose monitoring of all workers, including researchers like Dr. Ware, who were exposed to radiation.

This case also involves claims that Defendants improperly and unlawfully enrolled Dr. Ware in an investigational study, after his diagnosis with brain cancer and shortly after he underwent a major brain surgery to remove a large malignancy in his brain. Enrolling Dr. Ware in a cancer research study involving radiation treatment, when he had devoted his professional career to radiation-related research, was tragic in itself. The fact that Defendants failed to obtain his proper and legally-required consent gives rise to state law informed consent/battery claims."

*Plaintiff's Memorandum of Law in Support of Motion to Remand* [Document 9–1] [1], at 2–3.

Plaintiff's complaint includes twenty counts, seeking compensatory and punitive damages on theories of negligence, fraud, retaliation, corporate negligence, battery

---

1. Hereinafter "Plaintiff's Remand Memo."

and negligent infliction of emotional distress. *Original Complaint:* attached as exhibit to Plaintiff's Motion to Remand [Document 9–4], at 32–72. Named defendants include: Hospital of the University of Pennsylvania, University of Pennsylvania, Perelman School of Medicine, Trustees of the University of Pennsylvania [the "HUP Defendants"], the National Space Biomedical Research Institute ["NSBRI"], Center for Acute Radiation Research [CARR], Ann R. Kennedy, D.S.C., Gary Kao, M.D., and Michelle Alonso–Basanta, M.D. *Id.,* at 4–6.

On January 2, 2014, Defendants collectively filed a Notice of Removal pursuant to the Atomic Energy Act of 1954 ("the Act"), 42 U.S.C. § 2201 *et seq.,* as amended by the Price–Anderson Act, Pub.L. No. 85–256, 71 Stat. 576 (1957) (codified as amended in various sections of 42 U.S.C), and the Price–Anderson Amendments Act of 1988, Pub.L. No. 100–408, 102 Stat. 1066 (1988) (codified as amended in various sections of 42 U.S.C). *Notice of Removal* [Document 1], at 30. The Defendants also asserted removal pursuant to 28 U.S.C. § 1441(a) due to diversity of citizenship, and as to Defendant NSBRI pursuant to 28 U.S.C. § 1442(a)(1) [federal officer removal statute]. *Id.,* at 30–35.

On January 27, 2014, Plaintiff filed a motion to remand. The Defendants have responded, Plaintiff has filed a reply. I heard oral argument on the motion to remand on April 29, 2014.

It is Plaintiff's position that Defendants' removal to this Court was improper as none of the three claimed bases for removal are valid, and the matter should be remanded to the Philadelphia Court of Common Pleas. Specifically, Plaintiff argues: (1) The Price–Anderson Act provides no basis for removal because Defendants are not operators of a nuclear power

facility covered by the Act and the Act was not intended to cover university-based radiation-related research activities; (2) Defendant NSBRI's relationship to NASA does not mean Defendant here was acting as a federal officer and, therefore, the federal officer removal statute does not apply. Defendants cannot show a nexus or "causal relationship" between the conduct at issue and the alleged relationship between Defendant NSBRI and NASA; and (3) Defendants' reliance on diversity jurisdiction is completely unfounded. *Plaintiffs Remand Memo,* at 1.

The HUP Defendants oppose the motion to remand, arguing that the "the mere allegation that Dr. Ware suffered bodily harm from the radioactive properties of Cesium–137 makes this a Public Liability Action (PLA) pursuant to the Price–Anderson Act since Cesium–137 is 'by-product material' and, therefore, federal jurisdiction is proper. *Dumontier v. Schlumberger Tech.,* No. CV 04–16–BLG–RFC (September 2005); *affirmed,* 543 F.3d 567 (9th Cir.2008), *cert. denied,* 555 U.S. 1172, 129 S.Ct. 1329, 173 L.Ed.2d 587 (2009). Based upon the fact that the claim that [Dr.] Ware developed cancer from working with Cesium–137 is a federal claim under the Price–Anderson Act, the case was properly removed to federal court. In addition, this case was properly removed because [of] the government contractor defense." *HUP Defendants 'Memorandum of Law in Opposition to Plaintiff's Motion to Remand'* [Document 13][2], at 10. Defendants NSBRI and CARR join the HUP Defendants in opposing the motion to remand, agreeing that "Plaintiff's allegation that Dr. Ware suffered bodily harm from the radioactive properties of Cesium–137 makes this case a Public Liability Action (PLA) pursuant to the Price–Anderson Act because Cesium–137 is 'by-

---

**2.** Hereinafter "HUP Defendants' Opposition     to Remand."

product material'." *NSBRI/CARR Memorandum in Opposition to Plaintiff's Motion to Remand* [Document 14][3], at 8. In addition, Defendants NSBRI and CARR argue that removal is proper under the federal officer removal statute because NSBRI satisfies all of the prongs of the test:

"The facts clearly demonstrate that NSBRI's relationship with NASA was a 'special relationship' and that NSBRI was performing a service for NASA that NASA would otherwise have to perform. NSBRI is a 'person' 'acting under' NASA. The alleged acts or failure to act on the part of NSBRI complained of in Plaintiff's Complaint, such as failing to assure proper precautions were taken to protect Dr. Ware, as alleged, should have occurred as part of NSBRI's role under the Cooperative Agreement with NASA, thereby satisfying the 'under color of requirement."

*Id.*, at 20–21.

## III. DISCUSSION.

A defendant may remove from state court any civil action "of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). A removed action must be remanded "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). The burden of establishing the propriety of removal and the existence of federal jurisdiction is on the removing party, and the removal statutes are to be strictly construed with all doubts resolved in favor of remand." *Boyer v. Snap–On Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990), *cert. denied*, 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991).

---

**3.** Hereinafter "NSBRI/CARR's Opposition to Remand."

**4.** The statute provides: "A civil action otherwise removable solely on the basis of the

While the Defendants originally asserted three grounds for removal, they have conceded that they may not rely on diversity jurisdiction under the forum defendant rule, 28 U.S.C. § 1441(b)(2).[4] *HUP Defendants' Opposition to Remand*, at 6 ¶¶ 18–21; *NSBRI/CARR's Opposition to Remand*, at 5 ¶¶ 18–21.

### A. The Price–Anderson Act Confers Federal Jurisdiction.

#### 1. Statutory Framework.

In 1946, Congress passed the Atomic Energy Act, "a broad scheme of federal regulation and licensing," which established a federal monopoly over the development of nuclear power. Congress later permitted private sector involvement with the passage of the Atomic Energy Act of 1954 ["AEA"]. In 1957, Congress amended the AEA with the Price–Anderson Act "for the purpose of 'protect[ing] the public and ... encourag[ing] the development of the atomic energy industry.'" *See El Paso Natural Gas v. Neztsosie*, 526 U.S. 473, 476, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), and *In re TMI Litigation Cases Consolidated II*, 940 F.2d 832, 851–852 (3d Cir.1991), *cert. denied*, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).

The Price–Anderson Act ["PAA"] had three main elements:

"First the Act set a ceiling on the aggregate liability which could be imposed upon those engaged in the use and handling of radioactive material 'either through contract with the Government or under a license issued by the Federal Government for the private development of such activities[.]' [ ... ]

---

jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2).

The second important feature of the Act involved the 'channeling of liability.' Under this provision, any entity exposed to potential liability for activity resulting in a nuclear incident, even if it were not a direct participant in the activity, was entitled to indemnification. [ . . . ]

Finally the Price–Anderson Act established that [for] all public liability claims above the amount of required private insurance 'protection would be indemnified by the Federal Government, up to the aggregate limit on liability."

*In re TMI Litigation Cases Consolidated II,* 940 F.2d at 852 (3d Cir.1991).

The PAA was amended three times, and most significantly in 1988 when Congress expanded the reach of the Act to provide for removal of, and original jurisdiction over, public liability claims arising from any nuclear incident. *Id.* at 853 (3d Cir. 1991).[5]

■ The Price–Anderson Act as amended grants United States district courts original and removal jurisdiction over "any public liability action arising out of or resulting from a nuclear incident." *El Paso Natural Gas Company,* 526 U.S. at 484, 119 S.Ct. 1430 (1999). "Congress has thus expressed an unmistakable preference for a federal forum, at the behest of the defending party, both for litigating a Price–Anderson claim on the merits and for determining whether a claim falls under Price–Anderson when removal is contested." *Id.* at 484–485, 119 S.Ct. 1430. The Supreme Court remanded the *El Paso* case, in which plaintiff members of the Navajo Nation alleged that they were injured as a result of exposure to radioactive and other hazardous materials from uranium mining and processing on the Navajo Nation Reservation (and not a nuclear power plant), to the district court, concluding that the putative Price–Anderson action "if brought in state court would be subject to removal." *Id.* at 476, 484, 119 S.Ct. 1430.

The term " 'public liability action' encompasses 'any legal liability' of 'any person who may be liable' on account of a nuclear incident." *In re TMI Litigation Cases Consolidated II,* 940 F.2d at 854 (3d Cir.1991).[6] According to the Third Circuit, "Given the breadth of this definition, the consequence of a determination that a particular plaintiff has failed to state a public liability claim potentially compensable under the Price–Anderson Act is that he has no such claim at all. After the Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or *it is not compensable at all.* Any conceivable state tort action which might remain available to a plaintiff following the determination that his claim could not qualify as a public liability action, would not be one based on 'any legal liability' of 'any person who may be liable on account of a

---

**5.** Prior to the Price–Anderson Amendments Act of 1988, "the grant of federal jurisdiction and rights of removal were available only in actions resulting from an extraordinary nuclear occurrence." The decision to expand the jurisdictional grant was Congress' response to litigation which followed the 1979 accident at Three Mile Island nuclear power plant. *Id. See also El Paso Natural Gas Company,* 526 U.S. at 486, 119 S.Ct. 1430 (1999) ("The terms of the Act are underscored by its legislative history, which expressly refers to the multitude of separate cases brought 'in various state and Federal courts' in the aftermath of the Three Mile Island accident.").

**6.** Under the Act, the definition of "public liability" does not include "certain claims covered by workers' compensation, incurred in wartime or that involve the licensed property where the nuclear incident occurs." *In re TMI Litigation,* 193 F.3d 613, 625 fn. 9 (3d Cir.1999).

nuclear incident.' It would be some other species of tort altogether, and the fact that state courts might recognize such a tort has no relevance to the Price–Anderson scheme. At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action? If the answer to that question is 'yes,' the provisions of the Price–Anderson Act apply; there can be no action for injuries caused by the release of radiation from federally licensed nuclear power plants separate and apart from the federal public liability action created by the Amendments Act. [emphasis in original]"

*Id.* at 854–855 (3d Cir.1991).

The Act defines a "nuclear incident" as "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material [ . . . ]" 42 U.S.C. § 2014(q).

### 2. *Caselaw.*

Against this statutory backdrop, courts have been asked to determine the applicability of the Price–Anderson Act by analyzing the scope of its key terms. The results are varied and conflicting, both in terms of what the Act requires and what activities are covered. For example:

In 1995, the District Court for the Southern District of Ohio decided *In re Cincinnati Radiation Litigation,* holding that the Price–Anderson Act did not apply to Plaintiffs' claims that they were unwitting subjects of Human Radiation Experiments conducted at Cincinnati General Hospital because the existence of a nuclear occurrence as it is defined in the Act "does not occur when there is no unintended escape or release of nuclear energy." *In re Cincinnati Radiation Litigation,* 874 F.Supp. 796, 832 (S.D.Ohio 1995).

In 1998, the *Gilberg* Court conducted an extensive statutory analysis and concluded that "whether as a matter of statutory construction or the structure and history of the Act, no claim for public liability can lie in the absence of an applicable indemnity agreement." *Gilberg v. Stepan Company,* 24 F.Supp.2d 325, 343 (D.N.J.1998).[7]

In 1999, the *Carey* Court rejected plaintiffs' position "relying exclusively on *Gilberg*" in which they argued that there was no occurrence under the Act because defendant facility was not a signa-

---

7. The *Gilberg* Court admitted that "the path to [its] result is not entirely self-evident, and as a result, the few reported opinions which have confronted the issue have reached inconsistent and, I believe, incorrect results." *Id.* at 340. According to the *Gilberg* Court, in the case *In re Cincinnati Radiation Litigation,* the District Court for the South District of Ohio reached the correct result (that there was no occurrence under the Act) for the wrong reasons. The 10th Circuit, in *Kerr–McGee Corp. v. Farley,* "misconstrue[d] the Act" and misread caselaw in rejecting defendants' argument that the Price–Anderson Act did not apply because Kerr–McGee did not have an indemnity agreement with the United States.

The District Court for the Eastern District of Louisiana also failed to recognize that the scope of Price–Anderson coverage was narrower than the coverage of the Atomic Energy Act itself. *Id.* at 340–345. The *Gilberg* Court explained that "[t]he question never arises whether Price–Anderson applies to claims which are not subject to an agreement of indemnification. [ . . . ] In light of the infrequency with which the issue arises, it is not surprising that both courts and litigants continue to engender confusion when confronted with the argument that the Act applies to claims which do not fall within its coverage." *Id.* at 344–345.

tory to an indemnification agreement. The *Carey* Court opined that the *Gilberg* analysis, while "a thoughtful and an exhaustive examination of the statute," had "numerous problems" with statutory interpretation. *Carey v. Kerr–McGee Chemical Corporation,* 60 F.Supp.2d 800, 804–807 (N.D.Illinois 1999).

In 1999, the District Court for Massachusetts in the *Heinrich* case, addressed the applicability of the PAA to claims brought by family members of deceased patients who alleged that various doctors, institutions, and the United States government conspired to conduct extensive, unproven and dangerous medical experiments on terminally ill patients without their knowledge or consent. The Court granted Defendant MIT's motion for partial summary judgment and determined that the PAA did apply to the extent that plaintiffs' claims were premised on boron neutron capture therapy treatments. *Heinrich v. Sweet,* 62 F.Supp.2d 282, 299 (D.Mass.1999). In reaching this conclusion, the *Heinrich* Court rejected the *In re Cincinnati Radiation Litigation* standard, that a

nuclear incident should only be interpreted to mean an unintended escape or release of nuclear energy. The Court adopted the *Gilberg* analysis, ruling that the determinative issue for the applicability of the PAA is the existence of a government indemnification agreement. The *Heinrich* Court held that there was an indemnity agreement between the United States and the private defendants sufficient to trigger application of the PAA as a threshold matter, based on the initial record. *Id.* at 298–299.[8]

In 2000, the Fifth Circuit, in *Acuna v. Brown Root Inc.,* rejected Plaintiffs' attempt to limit the Price–Anderson Act's jurisdiction relying on the same arguments made in *Gilberg,* which the *Acuna* Court dismissed as "a tortured interpretation [which] is unnecessary, and runs counter to the plain language of the statute as well as the Congressional intent behind the 1988 amendment of § 2210(n)(2)." *Acuna v. Brown & Root Inc.,* 200 F.3d 335 (5th Cir.), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000).

8. The District Court expressly stated that its ruling on the applicability of the PAA "is based only on a preliminary record and is intended in no way to bind any subsequent tribunal faced with the task of determining whether the United States in fact must indemnify a judgment rendered against the private defendants." *Id.* at 298.

The indemnification issue was initially decided by the Federal Claims Court in favor of MIT and Massachusetts General Hospital [MGH] after a jury returned a verdict against MGH for wrongful death and negligence, and both MIT and MGH sought indemnification and reimbursement of litigation expenses. *Sweet v. United States,* 53 Fed.Cl. 208 (2002). In its initial opinion, the Federal Claims Court concluded that "the harm caused by these [boron neutron capture therapy] experiments indeed resulted in 'nuclear incidents.' [and ...] subsequently gives rise to a right of indemnification under the plain terms of the

Price–Anderson Act and the MIT E–39 Indemnity Agreement." *Id.* at 223–224. The Court opined: "Th[e] legislative history confirms that Congress intended to extend coverage for damages caused by radiation associated with *any* licensed activity, including medical experiments. [emphasis in original]." *Id.* at 224.

The Federal Claims Court later vacated its initial opinion, after the jury verdict against MGH was vacated and the parties settled rending its 2002 opinion moot. *MIT v. United States,* 75 Fed.Cl. 129 (2007). Finding that the equities and totality of the circumstances weighed in favor of vacatur of its earlier opinion, the Federal Claims Court noted: "A determination regarding the proper scope of the indemnity provisions of the Price–Anderson Act should await another case in which the litigation triggering the Act's indemnity provisions squarely address the parties' liability under the Act." *Id.* at 133..

In 2001, the District Court for the Northern District of Florida, in the *Samples* case, took issue with the defendants' attempt to support removal pursuant to the Price–Anderson Act in which they argued that the lawsuit was a public liability action because plaintiffs sought to recover damages for injuries arising out of a nuclear incident. The alleged nuclear material at issue was uranium and the defendants were an oil company, a chemical company and a wood treating company. The Court termed defendants argument "astonishing," and reject it stating: "Hogwash! This argument is frivolous. The Defendants should know that the PAA only applies to the nuclear energy and weapons industries. Interestingly, the Fifth Circuit recently clarified this point in a case in which Conoco was a party. The appellate court stated: 'The Price Anderson Act sets up an indemnification and limitation of liability scheme for public liability arising out of the conduct of the *nuclear energy and weapons industries.*' *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir.) *(emphasis added), cert. denied*, 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). [. . .] Furthermore, the word 'occurrence' as used in the definition of 'nuclear incident' means 'that event at the site of the *licensed activity, or activity in which the Commission has entered into a contract,* which may cause damage.' S.REP. NO. 296, at 16 (1957) (emphasis added), quoted in *10 C.F.R. § 8.2*, at 202 (2001). [. . .] The Defendants have failed to provide the Court with proof demonstrating they are a DOE contractor or an NRC licensee. Therefore, Plaintiffs' lawsuit does not state a cause of action under the PAA. The citizens of Pensacola can rest assured; there has not been a nuclear incident at the Agrico Chemical Site." *Samples v. Conoco, Inc.*, 165 F.Supp.2d 1303, 1321–1322 (N.D.Florida 2001).[9]

In 2008, the Ninth Circuit interpreted the PAA in *Golden v. CH2M Hill Hanford Group.* The Plaintiff worked at a nuclear facility in the Hanford Nuclear Reservation and on May 20, 2002, was working on a storage tank when four gallons of toxic liquid (which contained both radioactive materials and nonradioactive heavy metals) spilled on him. Plaintiff sued in state court; the action was removed to federal court pursuant to the PAA. The district court granted summary judgment in favor of the defendant based on a finding that plaintiff did not prove specific causation on his claim for physical injuries. The Ninth Circuit affirmed and separately discussed plaintiff's claim for emotional distress. The Circuit concluded that plaintiff, who was unable to show that his physical injuries were caused by the May 20, 2002 exposure, could not recover for psychic harm arising from exposure to radioactive materials. *Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683 (9th Cir.2008). However, the Court noted that "[. . .] it is possible that Golden suffered emotional distress from exposure to the nonradioactive materials that is separate and distinct from his emotional distress claim for exposure under the separate indemnification portions of the Act. [. . .]" The Fifth Circuit ultimately held that the district court's exercise of jurisdiction under the Price–Anderson Act was proper because uranium extraction and processing come within the ambit of the Act. *Acuna*, 200 F.3d at 339 (5th Cir.2000).

**9.** As noted above, the Fifth Circuit in *Acuna* rejected the arguments presented to the *Gilberg* Court, stating: "There is nothing in the definition of 'nuclear incident' which suggests that it should be contingent on whether the occurrence took place in a state which regulates its own uranium industry under NRC guidelines or whether the facility is covered

to the radioactive materials. If so, the former would not be preempted by the Price–Anderson Act, even though Gold can't show that he suffered physical injuries as a result of this exposure. [ . . . ] And Golden may be able to prove his claim under state law." *Id.* at 684.

In 2008, the Ninth Circuit also issued the *Dumontier* opinion. In that case, the Circuit Court affirmed the district court's grant of summary judgment in favor of an oil and gas technology company on claims by its employees who alleged exposure to Cesium–137. *Dumontier v. Schlumberger Technology Corp.*, 543 F.3d 567 (9th Cir.2008), *cert. denied*, 555 U.S. 1172, 129 S.Ct. 1329, 173 L.Ed.2d 587 (2009). The plaintiffs alleged that they were exposed to Cesium–137, which had been carelessly left on a drilling rig, and as a result suffered subcellular damage, including to their DNA. They brought a claim under Montana law; the defendant argued that the PAA preempted. The Ninth Circuit held that the PAA applied and preempted state law because "plaintiffs claim compensation for exposure to radioactive material." However, because the PAA "prohibits recover when plaintiffs haven't suffered 'bodily injury, sickness, disease, or death'," they did not meet the requirements of the PAA and, therefore, did not have a cause of action against the defendant. *Id.* at 571.

In 2011, the Fifth Circuit in *Cotroneo v. Shaw Environment & Infrastructure*, granted defendants' motion for summary judgment on plaintiffs' (workers who were employed in cleaning up radioactive materials and alleged that they had been harmed by excessive exposure to radiation at a former nuclear fabrication facility) PAA claims. The Fifth Circuit determined that plaintiffs who alleged that their employer and its supervisors failed to take appropriate precautions which could have prevented the excessive exposure to Americium–124 and Cesium–137 were asserting public liability claims as defined by the PAA. *Cotroneo v. Shaw Environment & Infrastructure, Inc., et al.*, 639 F.3d 186, 190 (5th Cir. 2011), *cert. denied*, —— U.S. ——, 133 S.Ct. 22, 183 L.Ed.2d 675 (2012). The Court opined that "a 'public liability' action' is a suit in which a party asserts that another party bears any legal liability arising out of an incident in which the hazardous properties of radioactive material caused bodily injury, sickness, or property damage." *Id.* at 194. While the Fifth Circuit ultimately affirmed the grant of summary judgment because plaintiffs' evidence was insufficient to raise a genuine issue of fact as to whether there was a causal connection between the radiation exposure and the plaintiffs' claimed injuries, the Circuit Court determined that the district court erred in holding that plaintiffs' "offensive contact" claims did not arise under federal law and declining to exercise supplemental jurisdiction. "The PAA, in section 2014(hh), provides that the entire suit, not just particular claims that are part of the suit, 'shall be deemed to be an action arising under section 2210.' Therefore, the 'offensive contact' claims, along with plaintiffs' other claims, must be treated as arising under federal law. [ . . . ] Given that the claims actually arise under federal law by operation of the PAA, however, the district court had original, rather than supplemental jurisdiction over them. As such, the district court could not decline to exercise that jurisdiction." *Id.* at 194–195.[10]

---

**10.** The Fifth Circuit determined that plaintiffs, who had successfully asserted jurisdiction pursuant to the PAA, could not recover on their offensive contact claims because these claims were not incident to the types of

In 2014, in the *Cotromano* case, the District Court for the Southern District of Florida denied plaintiffs' motion to remand, concluding that the PAA applied to plaintiffs' tort claims based on alleged uranium and thorium contamination. The Court rejected the *Gilberg* analysis as based on "flawed reasoning," concluding that neither an indemnification agreement, nor adequate financial protection, was required under the Act. *Cotromano v. United Technologies Corp.*, No. 13–80929–CIV–RYS–KAMP/HOPKINS [7 F.Supp.3d 1253, 1257–58], 2014 WL 1259629, at *4 (S.D.Fla. March 24, 2014). "[. . .] [T]he financial protection is a condition of obtaining a license, not a condition of establishing jurisdiction. [. . .] Whether or not Defendants have indemnification agreements with the federal government is not dispositive of the applicability of Price–Anderson to this case." [11]

### 3. *Analysis.*

Cases from Circuits other than the Third Circuit are not binding on this Court. The only binding authority, *In re TMI Litigation,* notes that the PAA transformed the entire landscape by creating a federal tort for "any legal liability of any person who may be liable on account of a nuclear incident." *In re TMI Litigation Cases Consolidated II,* 940 F.2d at 854 (3d Cir.1991). The Third Circuit opined that the term "public liability action," as de-

fined in the PAA, is broad and the Act is intended to provide original federal jurisdiction over claims arising from any nuclear incident. *Id.* at 853. The focus of the *In re TMI Litigation* decision was claims for injuries caused by the release of radiation from a federally licensed nuclear power plant. The Third Circuit did not address the applicability of the Act beyond the nuclear power plant setting.

■ Having canvassed relevant decisions from other circuits, I agree with the reasoning of those courts that have interpreted the term "public liability action" broadly to include any suit in which a party asserts that another party bears legal liability arising out of an incident in which the hazardous properties of radioactive material caused bodily injury, sickness or property damage. *See Cotroneo,* 639 F.3d at 194 (5th Cir.2011) (determining that under this definition claims by workers who were employed to clean up radioactive materials at a former nuclear source fabrication facility arose under the PAA). I do not believe, as Plaintiff suggests, that the PAA is limited to "nuclear incidents occurring at utilization and production facilities and other licensed facilities." *See* "*Plaintiff's Reply in Opposition of Defendants' Response to Motion to Remand*" [Document 15] [12], at 4.

The statutory analysis of those courts which have concluded that possession of a license for radioactive material and/or an

injuries named in the Act. The Court explained: "To be clear, the problem with the 'offensive contact' claims is not, as defendants argue, that the PAA forbids courts from entertaining claims whose elements do not include physical injury, illness or property damage—the harms the statute uses to define a 'nuclear incident.' [. . .] Rather, these claims are inconsistent with the PAA because, in this particular case, they would allow recovery without a showing that a nuclear incident occurred. In other words, had the plaintiffs successfully proven their bodily in-

jury claims and thus established the occurrence of a nuclear incident, a recovery on their 'offensive contact' claims would not be inconsistent with the PAA." *Id.* at 198.

**11.** In *Cotromano*, the plaintiffs did not deny the existence of a nuclear incident, but argued that "Defendants required licensing and certain financial indemnification agreements for this matter to be removable." *Id.* at 1257.

**12.** Hereafter "Plaintiff's Reply."

indemnification agreement is unrelated to establishing jurisdiction under PAA is, to me, persuasive and I adopt it. *See Carey v. Kerr–McGee*, 60 F.Supp.2d at 803–807 (N.D.Ill.1999) (explaining that in the absence of an express definition, the term "occurrence" which is used in the definition of "nuclear incident" should be given its common ordinary meaning and not read restrictively, as the *Gilberg* Court did, to narrow the intentionally broad class of nuclear liability cases for which Congress created federal jurisdiction under the PAA). *See also Acuna v. Brown & Root, Inc.*, 200 F.3d at 339–340 (5th Cir.2000) (concluding that there is nothing in the definition of nuclear incident which suggests that removal under the PAA is contingent on licensing or an indemnification agreement).

In the recently decided *Cotromano* case, the District Court for the Southern District of Florida denied Plaintiffs' motion to remand, holding that Plaintiffs' tort claims based on alleged uranium and thorium contamination "fall squarely within the unambiguous language of the Price–Anderson Act, which 'creat[ed] an exclusive federal cause of action for radiation injury.' [caselaw citation omitted]" *Cotromano v. United Technologies Corp.*, 7 F.Supp.3d 1253, 1257 (S.D.Fla.2014). The Court rejected Plaintiffs' arguments that there was no federal jurisdiction under the PAA because Defendants did not establish that they had a license for the radioactive material or an indemnification agreement with the federal government. Its analysis is instructive:

> "Plaintiffs do not deny the existence of a nuclear incident. Rather, Plaintiffs argue that Defendants required licensing and certain financial indemnification agreements for this matter to be removable. This argument is legally incorrect.
> The plain language of the statute indicates that the possession of a license for radioactive material is unrelated to the

jurisdictional issue. None of the statutory definitions limit the jurisdiction over nuclear claims to licensed activity. 42 U.S.C. § 2014(w) ('public liability'); 42 U.S.C. § 2014(hh) ('public liability action'); 42 U.S.C. § 2014(q) ('nuclear incident'). Elsewhere in the Price–Anderson Act, Congress expressly employed terms such as 'licensed activity,' 'licensed facility,' and 'facility subject to licensing.' *See e.g.*, 42 U.S.C. § 2201(m) ('Agreement regarding production'); 42 U.S.C. § 2284(a) ('Sabotage of nuclear facilities or fuel'); *see United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) ('Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.') (internal citations and quotations omitted). Thus, demonstration of a license for radioactive materials is not a prerequisite to federal jurisdiction under the plain language of the Price–Anderson Act. *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ('legislative purpose is expressed by the ordinary meaning of the words used').

Plaintiffs also argue that Defendants can only remove an action if they can point to an indemnification agreement under the Price–Anderson Act. Plaintiffs seem to refer to a portion of the Price–Anderson Act that provides for a limit on liability in public liability actions for certain entities that use radioactive materials that are indemnified by the federal government. *See* 42 U.S.C. § 2210(c)-(e). Those provisions relate to the indemnification and limitation of liability of licensed entities, not to federal court jurisdiction.

Plaintiffs cite *Gilberg v. Stepan Co.*, 24 F.Supp.2d 325, 340 (D.N.J.1998), for

the proposition that Price–Anderson does not apply unless the defendant has an indemnification agreement on the theory that there would be no 'nuclear incident' unless there was a licensed activity. Price–Anderson does not require a party to have an indemnification agreement, however. A plain reading of the Price–Anderson Act contradicts the *Gilberg* court's flawed reasoning, as pointed out by the Fifth Circuit in *Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir.2000) and in *Carey v. Kerr–McGee Chemical Corp.*, 60 F.Supp.2d 800 (N.D.Ill.1999). *Carey* explained that *Gilberg* improperly defined a 'nuclear incident' to occur only when there was an 'extraordinary nuclear occurrence' and for which there must be an indemnity agreement. 60 F.Supp.2d at 804–807. *Gilberg* ignored the intent of Price–Anderson by such a narrow construction. *Id.* at 807; *Acuna*, 200 F.3d at 339. The Price–Anderson amendments were enacted because Congress intended for federal law to apply not just to extraordinary nuclear occurrences, but also to 'a broader class of nuclear liability cases . . .' *Carey*, 60 F.Supp.2d at 807; *see also Acuna*, 200 F.3d at 339 ('one purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from 'extraordinary nuclear occurrences' only). As the Fifth Circuit explained in *Acuna*, '[t]here is nothing in the definition of 'nuclear incident' which suggests that it should be contingent on whether the . . . facility is covered under the separate indemnification portions of the [Price–Anderson] Act.' 200 F.3d at 339. Thus, 'Plaintiffs' attempts to reintroduce the limitations of 'extraordinary nuclear occurrence' into the 1988 amendments; substitution of 'nuclear incident' rely on

faulty statutory interpretation and are contrary to Congressional intent.' *Id.*

Plaintiffs further argue that there can be no federal jurisdiction unless the Defendants show 'adequate financial protection' and an 'indemnification agreement.' In the Motion to Remand, there is no citation to the statute and no context. But the financial protection language essentially tracks a different provision of the Act, which undercuts Plaintiffs' argument. Section 2210(a) states that 'licensees shall . . . have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Nuclear Regulatory Commission . . . shall require . . .' 42 U.S.C. § 2210(a). Thus, the financial protection is a condition of obtaining a license, not a condition of establishing jurisdiction. The section goes on to state that 'it may be a further condition of the license that the licensee execute and maintain an indemnification agreement.' *Id.* (emphasis supplied). Whether or not Defendants have indemnification agreements with the federal government is not dispositive of the applicability of Price–Anderson to this case."

*Cotromano*, 7 F.Supp.3d at 1257–59 (S.D.Fla.2014).

■ Following the analysis of the Courts cited above, I conclude that Plaintiff's claim of harm to Dr. Ware as a result of radiation emitted from the Cesium–137 in the Cesium irradiator while he was working as a research scientist, asserts a public liability claim as defined by the PAA. As a threshold matter, upon the preliminary record, removal based upon the applicability of the PAA to this claim was proper. *See Cotroneo*, 639 F.3d at 196–197 (5th Cir.2011) (distinguishing what

is required to assert that a nuclear incident occurred sufficient to make a suit a public liability action from what a plaintiff must prove to prevail in a public liability action).[13]

If it is ultimately determined that the existence of a license and/or indemnification agreement are determinative to the applicability of the PAA to Plaintiff's claim of alleged exposure to Cesium–137 emitted from the Cesium irradiator used by Dr. Ware, the HUP Defendants have provided a "Radioactive Materials License" issued to the "University of Pennsylvania Environmental Health and Radiation Safety Office" by the Pennsylvania Department of Environmental Protection, Bureau of Radiation Protection, which authorizes the use of "byproduct, source and/or special nuclear material," specifically Cesium–137. *HUP Defendants' Opposition to Remand,* Exhibit "A" (Affidavit of Eileen Normoyle, Radiation Safety Officer for HUP and attached license) [Document # 13–1], at 1– 8.[14] The License authorizes the use of Cesium–137 "for irradiation of materials in self-shielded irradiator devices that have been licensed with the U.S. Nuclear Regulatory Commission under 10 C.F.R. § 32.301 or with an Agreement State [...]," and provides specific use, storage and safety requirements. *Id.,* at 3, 4–6.

The HUP Defendants also assert that "Congress specifically contemplated Price–Anderson would apply to research at universities using byproduct material because Congress specifically waived some specific insurance requirements (known as 'financial protection' in the Price–Anderson scheme) for 'a nonprofit educational institution' such as the University of Pennsylvania. 42 U.S.C. § 2210(k). [...] Clearly, Congress specifically intended Price–Anderson application to the utilization of byproduct material, such as Cesium–137, in research experiments conducted to expand scientific progress; exactly what Dr. Ware was doing at the University of Pennsylvania when Plaintiff's complaint alleges the radiation emitted from the Cesium–137 caused Dr. Ware to develop brain cancer." *HUP Defendants' Opposition to Remand,* at 16–17.

Assuming *arguendo* that a narrower construction of the PAA was applied, I find that Defendants have made a sufficient showing, as a threshold matter, to deem Plaintiff's claim of harm to Dr. Ware as a result of radiation emitted from the Cesium–137 in the Cesium irradiator a public liability action.

**13.** Plaintiff argues: "Dr. Ware's animal research, for example, involved the use of a linear accelerator. A linear accelerator is also used to deliver radiation to human patients for cancer therapy. It would be absurd to think that any claim involving the use of a linear accelerator would be subject to the Price Anderson Act and federal jurisdiction." *Plaintiff's Remand Memo,* at 5 n 1. However, Defendants do not suggest that the PAA applies to all of Plaintiff's claims; they contend that the PAA "applies only [to] the allegations of any harm Dr. Ware allegedly suffered from radiation emitted from the Cesium–137 in the Cesium irradiator. Price–Anderson does not apply to any harm Dr. Ware allegedly suffered from x-ray radiation emitted from the linear accelerator mentioned in the complaint or to

any claims of alleged improper medical treatment for his brain cancer." *HUP Defendants' Opposition to Remand,* at 21. I agree, and limit the discussion of the applicability of the PAA to Plaintiff's claim of harm to Dr. Ware as a result of alleged exposure to Cesium–137 emitted from the Cesium irradiator during his research. The claim related to the Cesium–137 derives from Dr. Ware's alleged occupational exposure in the lab, and not medical malpractice allegations.

**14.** Pennsylvania is one of the "Agreement States," which have entered into an agreement with the Nuclear Regulatory Commission transferring the NRC's authority to license and regulate byproduct material to the state. *Id.,* at 1–2.

B. *NSBPI Has Met Its Burden With Respect To The Federal Officer Removal Statute.*

Defendants allege that this case was properly removed under the federal officer removal statute. They argue:

"In this matter, NSBRI satisfies all of the prongs of the test under the federal officer removal statute. The facts clearly demonstrate that NSBRI's relationship with NASA was a 'special relationship' and that NSBRI was performing a service for NASA that NASA would otherwise have to perform. NSBRI is a 'person' 'acting under' NASA. The alleged acts or failure to act on the part of NSBRI complained of in Plaintiff's complaint, such as failing to assure proper radiation precautions were taken to protect Dr. Ware, as alleged, should have occurred as part of NSBRI's role under the Cooperative Agreement with NASA, thereby satisfying the 'under color of requirement.

Defendant NSBRI has raised the government contractor defense in support of its removal. The facts establish that NSBRI is *the* focal point of NASA sponsored space biomedical research. There is a NASA Technical Officer authorized to represent NASA in discussions regarding NSBRI activities and to approve or disapprove NSBRI reports or technical information submitted to NASA. Senior NASA representatives including the NASA Technical Officer are a part of the NASA/NSBRI Steering Committee that meets on a monthly basis to discuss NASA–NSBRI activities and coordination. NASA gave direction as to the NSBRI Safety and Health Plan and approved the Plan. NSBRI acted in compliance with the Cooperative Agreement, the Management Plan, and the Health and Safety Plan. The imposition of liability on NSBRI, having entered into a cooperative agreement with NASA, directly implicates the significant federal interest in the completion of the government's work. NSBRI has a colorable federal contractor defense in this matter. [emphasis in original]."

*NSBRI/CARR's Opposition to Remand,* at 20–21.

Plaintiff does not dispute that NSBRI "follows regulations and procedures as set forth by NASA, a government entity." *Plaintiff's Reply,* at 5. However, Plaintiff argues, "the degree of removal between the research undertaken and the federal officer is too tenuous to claim that one is 'acting under' the other. [ . . . ] Dr. Kennedy is not manufacturing a product or performing an obligation that the government has compelled her to do, rather she is undertaking research for a non-profit organization that has ties to the government, nothing more." *Id.*

In addition, Plaintiff asserts that there is no causal nexus because "the conduct that is the basis of the claims in this case did not occur pursuant to any federal direction. Federal regulations required Defendants to abide by rules and regulations which would have protected Dr. Ware from excessive radiation exposure. It is the *failure* to abide by those rules and regulations that Plaintiff alleges is the cause of the claim. Had Defendants abided by all rules as required by federal regulations and had they done so at the behest of NASA, and if Dr. Ware's injury occurred because Defendants were following all applicable rules and regulations, then perhaps the causal nexus element of the federal officer removal statute would be met. [ . . . ] A team-oriented approach to research that includes federal government representatives does not provide the causal nexus required for the federal officer removal statute to apply." *Id.,* at 5–6.

■ The federal officer removal statute, set forth in 28 U.S.C. § 1442(a)(1), permits a federal officer, or person acting

under a federal officer, to remove a pending state action to federal court. Unlike the analysis to be undertaken with respect to other removal statutes, the provisions of the federal officer removal statute are to be "broadly construed." *See Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 777 (E.D.Pa.2010). The defendant seeking federal officer removal must establish: (1) that it is a "person" within the meaning of the statute; (2) that plaintiff's claims are based upon the defendant's conduct "acting under" a federal office; (3) that the defendant raises a colorable federal defense; and (4) that there is a causal nexus between the plaintiff's claims and the conduct performed under color of the federal office. *Feidt v. Owens Corning Fiberglas Corporation*, 153 F.3d 124, 127 (3d Cir. 1998).

■ In this case, it is the second, third and fourth elements of the *Feidt* standard that are at issue. As Plaintiff correctly asserts, the fact that NSBRI follows regulations and procedures set forth by NASA is not enough to prove that the entity is "acting under" a federal officer. "A defendant acts under a federal officer where his or her actions that led to the lawsuit were based on a federal 'officer's direct orders or comprehensive and detailed regulations.'" *Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d at 784 (E.D.Pa.2010).

■ NSBRI has come forward with more than sufficient evidence to meet the "acting under" requirement, and raise a colorable federal contractor defense for the purposes of determining jurisdiction.[15] When NSBRI conducts space biomedical research for NASA, it performs a service that NASA would otherwise have to perform itself. *See In re Proceeding in Which Commonwealth Seeks to Compel Defender Association*, No. 13–cv–1871, 2013 WL 4193960, at *7 (E.D.Pa. August 15, 2013) (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007) as holding "[ . . . ] that a private person 'acts under' a federal officer when his actions 'involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.' "). NSBRI has a "unique enabling role in NASA's space exploration objectives and [ . . . ] serve[s] as a valuable national resource in science, technology and education." *NSBRI/CARR's Opposition to Remand: Exhibit "F" (NSBRI 2010 Strategic Plan)* [Document 14–3], at 40.

NSBRI was created by NASA in 1997. Under the applicable "Cooperative Agreement," NASA and NSBRI agreed to "cooperative interaction," with anticipated "substantial NASA involvement during performance of the effort." *Id.: Exhibit "A" (Cooperative Agreement)* [Exhibit 14–2], at 3. NSBRI is required to take "all reasonable safety and health measures" in performing under the Cooperative Agreement, and comply with all federal, state and local laws as well as "the safety and health standards, specifications, reporting requirements, and provisions set forth in the Cooperative Agreement." NSBRI is further required to take "any other safety and health measures the [NASA] Grants Officer may reasonably direct." NASA retained the right to send an authorized

---

15. This Court may properly look to the evidence submitted by the parties in support of their pleadings on the motion to remand in weighing the merits of their positions. *Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d at 773 n. 3 (E.D.Pa.2010).

A "colorable defense need not be proven at this stage of the litigation due to the broad removal right the statute creates." Defendant NSBRI has identified facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial. If relevant facts developed in discovery do not support jurisdiction, this case can be remanded "at any time before final judgment." *Id.* at 781–782.

representative to "sites or areas where work under this contract is being performed in order to determine the adequacy of the Recipient [NSBRI]'s safety and health measures under this clause, on request." *Id.,* at 6–7. A "NASA Technical Officer" and "Alternate NASA Technical Officer" were identified, who have "the authority to approve or disapprove reports and any technical information [NSBRI] is required to submit to NASA for approval." *Id.,* at 19.

The impetus for entering into the Cooperative Agreement is described as follows:

"NASA is attempting to identify, implement, and test new ways of doing business that will achieve the desired end products with an optimized expenditure of resources (time, money, facilities, and personnel). Through implementation of this document [The Cooperative Agreement Management Plan], the NSBRI agrees to partner with NASA to identify and test new ways of doing business. All such resource expenditures (as identified above) shall be challenged by both parties to ensure that such resources are value added and/or are required by law, procurement policies, or prudent fiscal stewardship. The NASA/NSBRI partnership established and implemented through this CA/CAMP shares the joint objective of forging new relationships between government and academia, non-for-profit, and commercial entities, resulting in a new model for NASA to use in developing additional 'institutes' or other government agencies to use for similar purposes."

*Id.: Exhibit "C" (NSBRI Management Plan)* [Document 14–2], at 29.

The scope of work under the Cooperative Agreement is set forth in the "NSBRI's Management Plan." *Id.: Exhibit "A" (Cooperative Agreement")* [Document 14–2], at 3. The NSBRI Management Plan "provides details through which NASA and NSBRI will manage and conduct their joint activities in support of the NASA Bioastronautics effort," with both entities having "continuous significant interaction and pursue the Mission and Objectives that have been specified by NASA." *Id.: Exhibit "B" (Cooperative Agreement Management Plan)* [Exhibit 14–2], at 29–30. NSBRI's Mission is defined as follows:

"The Mission of the Institute will be to lead a National effort for accomplishing the integrated, critical path, biomedical research necessary to support the long term human presence, development, and exploration of space and to enhance life on Earth by applying the resultant advances in human knowledge and technology acquired through living and working in space. The Institute will be *the* focal point of NASA sponsored space biomedical research. [emphasis in original]"

*Id.,* at 30.

It is noted in the Management Plan that "[t]he NASA/NSBRI partnership is an important Bioastronautics partnership that is instrumental in enabling NASA to reach its vision and accomplish its goals. [ . . . ] Within the context of the NASA Bioastronautics Strategy, the NSBRI is a major stakeholder in the focused biomedical research effort for risk management purposes, including countermeasure definition and development; supporting mission critical issues for human space flight; disseminating and archiving data; and performing advocacy/development of the space biomedical research community." *Id.: Exhibit "C" (NSBRI Management Plan)* [Document 14–2], at 31–32.

NSBRI created a "Safety and Health Plan," and selected Baylor College of Medicine ["BCM"] as its agent "to perform certain of the coordination, administrative and compliance functions of the NSBRI with respect to these various health and

safety plans [of Consortium Institutions and selected NSBRI affiliates]." Primary responsibility for specific conduct of safety and health programs at each location remains with the Consortium Institution/selected NSBRI affiliate, which is required to have a safety plan that was consistent with NASA requirements. *Id.: Exhibit "D" (NSBRI Safety and Health Plan)* [Document 14–2], at 42.

A Consortium Institution or NSBRI affiliate which wants to use hazardous materials in research is required to submit an application to the applicable subcommittee of BCM (radiation safety, infectious agents/hazardous chemicals, animal biosafety, and recombinant DNA). The BCM subcommittees are charged with the responsibility to oversee experimentation and research involving the class of hazardous agent it regulates, to recommend policies and procedures relevant to the research, and to review activities associated with the use of the hazardous agent. *Id.,* at 44–45.

Consortium Institutions and NSBRI affiliates are required to "participate in the review and modification of safety requirements to be implemented by the Government as requested at the direction of the NASA Technical Manager in accordance with established NASA directives and procedures." *Id.,* at 45.

The record is replete with statements describing the unique NASA/NSBRI partnership and NSBRI's role as "an integral constituent of the nation's human space program." *Id.: Exhibit "F" (NSBRI 2010 Strategic Plan)* [Document 14–3], at 45. The following is a representative sample:

(1) "The NSBRI/NASA partnership unites the expertise and resources of the broad biomedical research community with NASA's engineering and operational capabilities. The programs emphasize the importance of integrated research teams and en-

courage productivity and diversity at all levels. The Institute's mission is consistent with NASA's Bioastronautics Strategy, namely managing risk, increasing efficiency, and returning benefits to Earth. The Institute supports the Agency's mission-driven and enabling goals, especially, 'to extend the duration and boundaries of human space flight to create new opportunities for exploration and discovery' and assists NASA in fulfilling its overall vision 'to improve life here, to extend life to there, to find life beyond.'" *Id.: Exhibit "F" (NSBRI Revised Strategic Plan, dated July 17, 2003)* [Document 14–3], at 5.

(2) "NSBRI is a unique, not-for-profit scientific partnership established in 1997 following competitive selection by NASA. Since its inception, and in collaboration with the Johnson Space Center (JSC) through a Cooperative Agreement, NSBRI has initiated and cultivated its leadership role in space biomedical research through novel strategies to meet its mission, goals, and objectives as set forth by NASA. The Institute engages, facilitates, and coordinates outstanding academic, government, and industry researchers and educators in a team-based effort to develop countermeasures to reduce and/or eliminate health risks associated with human space travel. It also leverages the resources of the nation's leading biomedical research institutions and industry, allowing the combined intellectual and infrastructural capacities to advance NASA's biomedical research program in an unprecedented manner. NSBRI is well positioned to efficiently and effectively conduct ground and critical in-flight studies of high relevance and impact for NASA, with tangible benefits for the people of Earth." *Id.,* at 6.

(3) NSBRI "is an integral constituent of NASA's Biomedical effort, which is sponsored by the Office of Space Flight, the Office of Biological and Physical Research, and the Office of the Chief Health and Medical Officer. [...] NSBRI significantly contributes to the implementation of the 11 Bioastronautics strategies." *Id.,* at 8.

(4) The organizational structure of NSBRI "fosters the NASA/NSBRI partnership at multiple levels. NASA and NSBRI manage and conduct their joint activities to benefit all stakeholders (e.g., NASA, Congress, the public, academic institutions, team leaders, investigators, international partners)." *Id.,* at 20.

(5) 'NSBRI's lean and efficient management structure [citation to chart omitted] allows the Institute to adapt to and be in compliance with changing NASA priorities and requirements." *Id.: Exhibit "F" (NSBRI 2010 Strategic Plan)* [Document 14–3], at 68.

(6) "These improvements ensure that NASA and the American people receive a solid return on the investment made in NSBRI." *Id.,* at 70.

(7) "The NSBRI operates under a Cooperative Agreement with NASA (NCC 9–58), and our research program involves a number of special requirements that stem directly from that agreement and the unique nature of our focused, team-oriented approach to research." *Id.: Exhibit "H" (NSBRI August 18, 2008 Letter Accepting the Penn Proposal)* [Exhibit 14–3], at 105.

▮ NSBRI has also satisfied the causal nexus requirement by demonstrating that the acts for which NSBRI is being sued (negligence in failing to meet their

"duty of care to assure that all proper radiation precautions were taken to protect Dr. Ware's safety and well-being" [16]) occurred because of what was being performed for the government. *See In re Proceeding in Which Commonwealth Seeks to Compel Defender Association,* 2013 WL 4193960, at *9 (E.D.Pa. August 15, 2013) (the causal nexus requirement is satisfied if the charged conduct is related to an asserted federal authority).

NSBRI solicited proposals, including the CARR proposal at issue here, "from the entire biomedical research community annually through open solicitations that are coordinated with, and approved by, NASA." *NSBRI/CARR's Opposition to Remand: Exhibit "F" (NSBRI Revised Strategic Plan, dated July 17, 2003)* [Document 14–3], at 12. The CARR Request for Application [17] sought "proposals for an NSBRI Center for Acute Radiation Research (NSBRI–CARR) as part of the NSBRI Radiation Effects Team and in support of the NASA's Human Research Program (HRP) and the Space Radiation Program Element (SRPE)." *Id.: Exhibit "G" (NSBRI Research Opportunities Soliciting CARR)* [Document 14–3], at 75.

The CARR RFA explains:

"In order to identify and make publicly known the biomedical and health risks of spaceflight and the research and technology gaps that must be answered to reduce those risks, NASA has developed the Human Research Program (HRP) Integrated Research Plan (IRP). The IRP documents what activities are necessary to fill identified knowledge gaps, when those activities will be accomplished, where they will be accomplished (e.g., using the International Space Station, ground analogs, or ground research

---

**16.** *See Plaintiff's Motion to Remand: Exhibit "B" (Complaint)* [Document 9–4], at 64.

**17.** Hereafter "CARR RFA."

laboratories), who will accomplish them (which project or organization within the HRP), and what the expected product will be."

*Id.,* at 79. The CARR RFA targets one of four risks identified in the current IRP: "Acute Radiation Syndromes and the associated set of research and technology gaps listed in Appendix A: Integrated Research Plan." *Id.*

The CARR RFA states that "[t]he NSBRI–CARR program is expected to enhance NSBRI's and NASA's base of scholarship, skills, and performance in the space biological and biomedical sciences and related technology areas, and to expand the pool of research scientists and engineers trained to meet the challenges ahead as we prepare for future human space exploration missions." *Id.,* at 80.

The CARR RFA states that it will be funded by NSBRI for one year at a time, and that "[ ]the CARR Director is expected to work closely with the appropriate technical representatives from NSBRI and NASA in order to assure continued success and programmatic relevance." *Id.,* at 83.

There is a section in the CARR RFA entitled "**NASA** Safety Policy:" which states:

"Safety is **NASA**'s highest priority. Safety is the freedom from those conditions that can cause death, injury, occupational illness, damage to or loss of equipment or property, or damage to the environment. **NASA**'s safety priority is to protect: (1) the public, (2) astronauts and pilots, (3) the NASA workforce (including employees working under NASA instruments), and (4) high-value equipment and property. **All research conducted under NSBRI**

**auspices shall conform to this policy.** [emphasis added]."

*Id.,* at 85.

NSBRI required all proposals submitted for the CARR RFA include assurance of compliance with human subjects and/or animal care and use provisions within 90 days of notice of award, citing NASA Police Directive (NPD) 7100.8e "Protection of Human Research Subjects," and animal use and care requirements as described in Title 14 of the NASA Code of Federal Regulations. *Id.,* at 89.

NSBRI has met the causal requirement under the *Feidt* standard. *See Hagen,* 739 F.Supp.2d at 785 n. 14 (E.D.Pa.2010) (opining that the causal nexus requirement is closely related to the "acting under" requirement which has led some courts to collapse the causal nexus and acting under into a single requirement).

## IV. RECOMMENDATION

Consistent with the above analysis, I find that there are two independent bases to support federal jurisdiction and, therefore, recommend that Plaintiff's Motion to Remand be denied.

Filed May 5, 2014.